**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL BRADLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 11-cv-0003** |
| | ) | |
| **MICHAEL ASTRUE, Commissioner** | ) | **Magistrate Judge Jeffrey Cole** |
| **of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

The Plaintiff, Michael Bradley, seeks review of the final decision of the Commissioner

("Commissioner") of the Social Security Administration ("Agency"), who denied his application

for Disability Insurance Benefits ("DIB") under Title II, Sections 216(i) and 223(d) of the Social

Security Act ("Act") and for Supplemental Security Income ("SSI") under Title XVI, Section

1614(a)(3)(A) of the Act. Mr. Bradley asks the court to reverse and remand the Commissioner's

decision, while the Commissioner seeks an order affirming the decision.

**I.**

**PROCEDURAL HISTORY**

Mr. Bradley filed concurrent applications for DIB and SSI on March 14, 2007, alleging

he had been disabled since January 15, 2007, due to major depression, suicidal ideations, stress-

related anxiety, hypertension, and migraine headaches. (Administrative Record ("R.") 180). Both

of his claims were initially denied on May 21, 2007, and upon reconsideration on October 9,

2007. (R.14). Mr. Bradley filed a written request for hearing on November 20, 2007 (20 CFR

404.929 *et seq.* and 416.1429 *et seq.*). The Administrative Law Judge (ALJ) convened a

hearing[1], at which Mr. Bradley, represented by counsel, appeared and testified. (R. 36-64). In addition, Dr. Daniel Schiff testified as medical expert (R. 64-70) and Ms. Fawcett testified as vocational expert (R. 70-85)[2].

On December 17, 2009, the ALJ issued a decision, denying Mr. Bradley's application for DIB and SSI. (R. 14-24). The ALJ found that Mr. Bradley was not disabled because he possesses a residual functional capacity consistent with unskilled, routine, and simple tasks, of which there exist a significant number of jobs in the national economy that the plaintiff can perform given his age, education, and work experience. (R. 17-24). This became the final decision of the Commissioner when the Appeals Council denied Mr. Bradley's request for review on October 27, 2010. (R. 1-3). *See* 20 C.F.R. §§ 404.955; 404.981.

Plaintiff seeks judicial review of the Commissioner's denial of his claims. The federal district court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). On April 21, 2011, both parties consented in writing to proceed before a Magistrate Judge pursuant to 28 U.S.C. §636(c).

---

[1] The record reflects a discrepancy in the date of the hearing. The hearing transcript reported that the hearing was held on two dates: September 10, 2009 (R. 29) and November 10, 2009 (R. 31). The ALJ reported that the hearing was held on September 10, 2009. (R. 14). The plaintiff's memo reported the hearing was on October 6, 2009. (Pl.'s Mem. at 1).

[2] While the transcript refers to the vocational expert as Ms. Fawcett (R. 29, 30, 70), the curriculum vitae in the record (R. 134) and Mr. Bradley's brief refer to the vocational expert as Cheryl Hoiseth.

## II.
## EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Mr. Bradley was born on January 21, 1960, making him forty-nine years old at the time of the ALJ's decision. (R. 36). He is single, never been married, and has one child (R. 255). He is approximately 5'4" and weighs 138-pounds. (R.179). The plaintiff has an eleventh-grade education and his past relevant work includes: foundry machine operator (June 1995 to Aug. 1998), UPS mail handler and forklift driver (Aug. 1998 to Aug. 1999), museum janitor (Sept. 1999 to May 2001), laundry presser and production line worker (Aug. 2001 to Feb. 2005), cook (Aug. 2005 to Jan 2006), meat packer (Feb. 2005 to Jan. 2007). (R. 186-194). During the longest period of Mr. Bradley's employment – as a presser at a laundry cleaning service for approximately three and a half years – the workday roughly included walking for eight hours, standing for eight hours, kneeling or couching for five hours, operating machinery with no technical skill or knowledge required, and frequently lifting 25-pounds with the heaviest load at 40-pounds according to the Disability Report (R. 181) or 20-pounds according to the Social Security Work History Report. (R.189). At the time of the hearing, Mr. Bradley was not employed.

### B.
### The Medical Evidence

Mr. Bradley was admitted to Madden Health Center in February 2007 after expressing suicidal intentions at the Provident Hospital Emergency Room. (R. 252-256). Mr. Bradley was diagnosed with depressive disorder – not otherwise specified, substance-induced mood disorder, and cocaine abuse. (R. 255). Upon discharge, Mr. Bradley was psychiatrically and medically stable: no suicidal ideation, improvement in judgment, appropriate behavior, and no danger to

3

himself or others. (R. 256). He continued to receive mental health treatment. He first visited Chatham Avalon Community Mental Health Center (CMHC) in March 2007, complaining of suicidal ideation, depression, and a mental condition. (R. 209). Dr. Douglas prescribed counseling and the following medication: Propranolol, Enalapril, and Hydrochlorothazide for high blood pressure, Lexapro for depression, and ibuprofen for headache. Mr. Bradley reported side effects of dizziness and drowsiness (R. 211).

On May 4, 2007, consultative examiners conducted psychiatric and physical evaluations of Mr. Bradley. In the psychiatric evaluation, Dr. Henry Fine reported that Mr. Bradley had a long history of depression, loneliness, depressed mood, psychomotor retardation, slowed speech, some suicidal thoughts, auditory hallucinations, and poor sleep. (R. 295-296). He also had a history of long-term alcohol and Cocaine abuse, both of which were in remission for the past month. (R. 296). In the physical examination, Dr. Sandra Hare reported that the plaintiff had clear lungs, regular cardiac rhythm, high blood pressure at 131/101, full range of motion of all joints, no difficulty getting on and off the examination table, normal gait, full bilateral finger and hand grasp/grip/extension, sustained audible and understandable speech, and intact memory. (R. 302-303).

Throughout Mr. Bradley's 2007 to 2009 treatment at CMHC, his overall condition improved. (R. 389). The treatment record reflects that his mood oscillated, whereas his mental status – attention, thought-process, and thought-content – were within normal limits. (R. 389-410). In his most recent treatment report on August 19, 2009, Mr. Bradley had no new complaints, had been compliant with his medications, did not experience any side effects from his medications, and did not report recurrence of mood or psychotic symptoms. (R. 389).

Mr. Bradley completed an Activities of Daily Living Questionnaire ("Questionnaire") in April 2007. He reported that he lives in an apartment with his mother, that he does not cook his own meals, but that he does his own ironing, laundry, and personal care, and that he helps with grocery shopping twice a month. (R. 195-196). He said he takes several medications and needs the help of his mother and girlfriend to remind him to take his medicine and keep appointments. (R. 196). Mr. Bradley reported that he has difficulty remembering tasks and finishing things he starts, and that he gets lost and loses things. (R. 196). He has difficulty sleeping because of nightmares. (R. 197). He also alleged that he hears voices and sees people who are not around, which interferes with his daily activities. (R. 196). He is able to leave home and travel by himself on foot or on the bus. (R. 197). He enjoys people and being with others, but he sometimes is afraid of people, tends to get angry, or fights with others. (R. 197).

He reported that he enjoys fixing things, fishing, playing softball and cards, watching television, listening to the radio, and talking on the phone. (R. 196-197). He attends church and a mental health program. (R. 197). As for his physical impairments, Mr. Bradley indicated that his right arm goes numb when opening twist lids on jars or when reaching overhead. (R. 200). He also alleged that he experiences shortness of breath most of the time when standing or moving about and sometimes has to hold onto the wall or furniture for balance. (R. 200). Mr. Bradley reported that he can climb thirty or more stairs and can sit for one hour without having to stand up (R. 200).

In August 2007, Mr. Bradley completed another Questionnaire. In contrast to the one he filled out in April 2007, he said no longer experienced numbness when opening twist lids or reaching overhead, but he had problems tying his shoes and could not carry anything over ten pounds. (R. 223). He sometimes needs assistance standing and balancing, but is able to sit for

two hours without needing to stand and can sometimes perform household chores. (R. 224). He reported that he no longer performs household chores, but is able to take care of his personal care. (R. 227). He also no longer enjoys being around people, but does not tend to get angry or fight with people anymore. (R. 228).

Mr. Bradley's girlfriend, Karen Randle – who has known him for eight years -- completed a third-party function report. (R. 215). She reported that Mr. Bradley lives with her and his mother. (R. 215). Ms. Randle indicated that a daily schedule for Bradley includes going to rehab, doctor appointments, and sleeping most of the time. (R. 215). She reported that he does not need help caring for himself, but sometimes needs to be reminded to take his medication. (R. 216). He does chores around the house, like sweeping the floors and washing the dishes, but he sometimes forgets to turn the water or stove off. (R. 215-216). Ms. Randle indicated that Mr. Bradley can travel on public transportation alone and can go grocery shopping by himself. (R. 217). Though he can count money, he is not responsible for paying his bills. (R. 217). Mr. Bradley's hobbies include watching television, playing ball, fishing, talking on the phone, and going to the community center. (R. 219). Mr. Bradley gets along with others, including authority figures, but tends to argue when his personality changes. (218-219). She stated that he once was terminated from his place of employment for not following orders and has a short attention span. (R. 219-220).

## C.
### The Administrative Hearing Testimony

#### 1.
#### Mr. Bradley's Testimony

At his hearing, Mr. Bradley reported that he has trouble obtaining and holding a job due to his depression, alcohol, and cocaine abuse. (R. 296). While he admits to cocaine and alcohol

use, he reported that he has not used cocaine for about a year (R. 49) and only drinks occasionally – about two to three cans of beer more than once a week – and he further acknowledged that his doctors are not aware that he drinks (R. 50, 65). He testified that his inability to hold a job was mostly due to the depression, for which he reported that he receives treatment about every two months from a psychiatrist and a therapist. (R. 51). He reported that he felt like he wanted to hurt himself or somebody else, feared that people were trying to do something to him, and he had problems with anger and frustration. (R. 52). He had trouble falling asleep at night and would doze off during the day (R. 54), and he also reported that he was a suicidal person. (R. 45). When asked if he has had any recent ideas or thoughts about committing suicide or hurting himself, he answered no. (R. 48). When asked if he heard or hears voices, Mr. Bradley testified that he sometimes hears voices even when on medication. (R. 62). But, when questioned on the issue, he said that the medication helps and he only hears voices when he forgets to take his medication. (R. 63). He also reported that he has difficulty concentrating and would stray off task about every ten to fifteen minutes. (R. 63).

Mr. Bradley said he suffered from migraine headaches, which started around the age of sixteen and worsened after he suffered a head trauma from a motorcycle accident. He reported that the migraines occur twice a day for about 30 to 35 minutes, but that they subside after he takes medication and lies down. (R. 45-47). Mr. Bradley reported additional physical ailments and difficulties, including high blood pressure, arthritis in his right shoulder and hand, problems with his hearing and breathing, and pain in his lower back from an injury that occurred while playing softball in July 2009. (R. 45, 57-60).

**2.**
**The Medical Expert's Testimony**

The medical expert, Dr. Daniel Schiff, testified that the two issues of substance abuse and depression were intertwined and could not be separated. (R. 65, 69). According to Dr. Schiff's reading of the record, Mr. Bradley shows significant improvement with both of these issues because he has become abstinent and compliant with his medication. (R. 65). Dr. Schiff testified that Mr. Bradley has been labeled with euthymic – or normal mood – in his last couple of doctor appointments (6 November 2008, 14 May 2009, and 19 August 2009) (R. 66). He also reported that Mr. Bradley did not report any problems with hallucinations during those last two doctor visits. (R. 66)

In terms of functional assessment, Dr. Schiff testified that he believes Mr. Bradley to be relatively functional based on his most recent DSM-IV Global Assessment of Functioning Scale (GAF). On a 100-point scale measuring the patient's overall level of psychological, social, and occupational functioning, Mr. Bradley was assigned a GAF of 55 to 60, which indicates moderate symptoms. This was based on his ability to interact with friends by playing ball, fishing, and other activities and his ability to ride the CTA, cook, shop, and do chores. (R. 67). Dr. Schiff did not find that Mr. Bradley met or medically equaled any listing. (R. 67). The expert found there was a gradual improvement in response to Mr. Bradley's treatment at the Madden Health Center. When Mr. Bradley was compliant with his medication and abstinent from drugs and alcohol, he was relatively functional, but when Mr. Bradley was not compliant and used cocaine, his symptoms resurfaced. (R. 67-68).

**3.**
**The Vocational Expert's Testimony**

The vocational expert ("VE") described Mr. Bradley's past work skill level: presser was medium work with a skill level or Specific Vocational Preparation (SVP) of three, which is on the low end of the semi-skilled continuum; foundry work was heavy, unskilled work; forklift driver was medium, semi-skilled with an SVP of three; museum job as a stock person was heavy, semi-skilled with an SVP of four; UPS job as a material handler was heavy, SVP of three, and semi-skilled (R. 75-76). When Mr. Bradley was asked about the discrepancy between the reports on what the heaviest load that he could lift at his job as a presser, 20 or 40 pounds, he responded twenty-five pounds. (R. 72). The VE described Mr. Bradley as a young individual with a limited education, who has past relevant work of medium and heavy work, low end of semi-skilled without transferrable skills. (R. 76).

The ALJ posed a hypothetical question to the VE about a person with the same vocational profile as Mr. Bradley, working in one of the fourteen counties of the greater Chicago area, who could perform unskilled, routine, simple work, lift and carry 50-pounds occasionally and 25-pounds frequently, sit, stand or walk for 6-hours in an 8-hour workday, and who must avoid concentrated exposure to pulmonary irritants. (R. 76-77). In response, the vocational expert testified that such a person could perform work as a hand packager (approximately 10,000 jobs available) and warehouse worker (3,300 jobs available). (R. 77-78). These two types of jobs require the individual to be on task 90% of the time. (R. 83). If the hypothetical scenario was further restricted to lifting and carrying a maximum load of 20-pounds frequently and 10-pounds occasionally and only using the right arm to occasional overhead reaching, then the individual could perform work as a counter clerk (4,700 jobs) and lobby attendant (5,000 jobs). (R. 78-80). These jobs require the individual to concentrate and be attentive 80% of the time. (R. 84).

**D.**
**The Administrative Law Judge's Decision**

The ALJ followed a five-step sequential process in determining whether Mr. Bradley was disabled. In step one, the ALJ found that Mr. Bradley met the insured status requirements of the Social Security Act through January 15, 2007. (R. 16). Second, the ALJ found that Mr. Bradley had severe impairments of migraine headaches, hypertension with no end organ damage, depression, and a history of substance abuse in partial remission. (R. 16). Third, the ALJ found that Mr. Bradley's impairments do not meet or medically equal any of the listed impairments. In terms of degree of limitation in the broad areas of functioning set out in the disability regulations for evaluating mental disorders and in the mental disorders listings, the ALJ found the plaintiff had *mild* restriction of activities of daily living, *moderate* difficulties in maintaining social functioning, *moderate* difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation. (R. 17). The ALJ also noted that Mr. Bradley's mental impairment did not satisfy the "paragraph C" criteria of the applicable mental disorder listing. (R. 17). In regards to the plaintiff's residual functional capacity, the ALJ found that the limitations satisfied the "paragraph B" criteria. The ALJ determined that Mr. Bradley had the following residual functional capacity: lift/carry 50-pounds occasionally and 25-pounds frequently, sit 6 of 8 hours in a workday, stand/walk 6 of 8 hours in workday, and work consisting of unskilled, routine, and simple tasks. (R. 17).

In considering Mr. Bradley's symptoms, the ALJ conducted a two-step process in which it was first determined whether there was an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the plaintiff's pain or other symptoms. Next, the ALJ evaluated the intensity, persistence, and limiting effects of the Mr. Bradley's symptoms to determine the extent to which they limit his ability to do basic work

activities; whenever statements referring to these three factors were not substantiated by objective medical evidence, the ALJ made a finding on the credibility of the statements based on a consideration of the entire case record. (R 15-16). Based on Mr. Bradley's testimony and his Activities of Daily Living Questionnaires, the ALJ found that the plaintiff's medically determinable impairments could be reasonably expected to cause the alleged symptoms.

However, the ALJ found Mr. Bradley's statements concerning the intensity, persistence, and limiting effects of these symptoms not credible to the extent that they were inconsistent with the above residual functional capacity assessment. (R. 19). The ALJ determined that Mr. Bradley's testimony and allegations regarding the degree of his functional limitations were not supported by the objective medical evidence. (R. 19). While Mr. Bradley continued to claim depression and suicidal ideation, the medical reports indicated that his condition significantly improved and he was relatively functional when he was compliant with his medication. Based on Dr. Fine's psychiatric evaluation, the ALJ found that Mr. Bradley's depression was severe but he retained the capacity for simple, routine unskilled work. (R. 20).

Even though Dr. Fine reported that Mr. Bradley exhibited difficulty with calculation, memory, thinking, and judgment, the ALJ found that this evaluation was completed roughly one month after discharge from Madden Health Center and before his treatment for substance abuse began. Additionally, the medical treatment notes indicated that Mr. Bradley's condition significantly improved since May 2007 and he consistently scored 55-60 on the GAF. The ALJ determined that he retained the ability to sustain work, as was evident from his testimony, which demonstrated that when he was compliant with his medication, he was competent in performing daily activities, such as completing household chores, leaving his house alone, using public transportation, interacting with friends, and other activities. (R. 20-21). While Mr. Bradley

11

complained of forgetfulness and an inability to concentrate on tasks, the CMHC medical records reported that his attention was within normal limits. Still, the ALJ accounted for these concerns by limiting Mr. Bradley's residual functioning capacity to simple, routine, unskilled work. (R. 21).

In regard to Mr. Bradley's substance abuse and migraine headaches, the medical record indicated significant improvement. His substance abuse was in partial remission: he completed a detoxification process on March 19, 2007, and completed outpatient treatment from Woodlawn Organization on May 3, 2007. (R. 330). Mr. Bradley testified during the hearing that he stopped using drugs a year ago and only occasionally drinks beer. The ALJ accounted for any potential substance abuse that could impede his ability to concentrate by limiting his work to simple, routine, unskilled work. In terms of his alleged migraines, the ALJ found that the testimony was not credible. The ALJ determined that the medical record does not support the severity of Mr. Bradley's complaints, but rather indicated that the headaches are "stable" and "controlled." (R. 21). Additionally, Mr. Bradley had a history of hypertension that was controlled by medication and it was only when he did not take his medication that the hypertension was "uncontrolled." (R. 21).

The ALJ also found that Mr. Bradley's allegations of physical impairments were not credible. Not only did the medical record not support these claims of physical pain, but he was also engaged in a number of physical activities that would be impeded by such pain and thus the testimony was contradicted by the evidence. Neither the objective medical report nor Dr. Hare's physical examination indicated any problems with the plaintiff's walking, standing, sitting, extending or flexing his extremities, or reaching overhead. (R. 300-303). For all these reasons, the ALJ found that Mr. Bradley retained the physical ability to work at a medium exertion level

and to lift/carry 50-pounds occasionally and 25-pounds frequently, sit 6 or 8 hours in a workday, and stand/walk 6 of 8 hours in the workday. (R. 22). And, the residual functional capacity was supported by the medical evidence, the opinion of the testifying medical expert, the consultative examinations, and the findings of the state agency medical consultants. (R. 22).

The ALJ determined that Mr. Bradley was unable to perform his past relevant work as a presser (medium and semi-skilled work), foundry worker (heavy and unskilled work), museum stock person (heavy and semi-skilled work), forklift driver (medium and semi-skilled work), and material handler (heavy and semi-skilled work). (R. 23). However, in the fifth and final step of the ALJ's decision, the ALJ found that based on his age, education, work experience, and residual functional capacity, there were other jobs that exist in significant numbers in the national economy that Mr. Bradley can perform. (R. 23).

### III.
### DISCUSSION

#### A.
#### The Standards of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). The court reviews the ALJ's decision directly, but does so with deference, *Weatherbee v. Astrue*, 649 F. 3d 565, 568-569 (7th Cir. 2011), and with a limited role of not making independent credibility determinations or reconsidering the facts and evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir.2000); *Simila v. Astrue*, 573 F.3d 503, 513-514; *Elder*, 529 F.3d at 413. The court does "not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir.1993). Substantial evidence is "more than a mere scintilla" and is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). If the court finds that the ALJ's decision is supported by substantial evidence, then the court must affirm the decision, even if reasonable minds may differ as to whether the plaintiff is disabled. 42 U.S.C. § 405(g); *Books v. Chater*, 91 F.3d 972, 978 (7th Cir.1996). However, since conclusions of law are not entitled to such deference, if the Commissioner committed an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir.2007).

While the standard of review is deferential, the court cannot "rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir.2002). Although the ALJ need not address every piece of evidence, the ALJ cannot subjectively limit his discussion to only the evidence that which supports his ultimate conclusion. *Herron*, 19 F. 3d at 333. The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir.2009). The Seventh Circuit refers to this process as building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet*, 78 F.3d at 307. It is a "lax" standard. *Berger*, 516 F.3d at 545. It is enough if the ALJ "'minimally articulate[s] his or her justification for rejecting or accepting specific evidence of a disability.'" *Berger*, 516 F.3d at 545; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001).

**B.**
**The Five-Step Sequential Analysis**

14

To qualify for disability benefits, a claimant must be "disabled," which is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Stanley v. Astrue*, 410 Fed. Appx. 974, 976 (7th Cir.2011); *Liskowitz v. Astrue*, 559 F. 3d 736, 739-740 (7th Cir.2009). The claimant must also show that the disability arose while he or she was insured for benefits. *See* 42 U.S.C. §§ 423(a)(1)(A), (c)(1); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 802 (7th Cir.2005).

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) Is the plaintiff currently unemployed;
2) Does the plaintiff have a severe impairment;
3) Does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
4) Is the plaintiff unable to perform his past relevant work; and
5) Is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila*, 573 F.3d at 512-513; *Briscoe ex rel. Taylor*, 425 F.3d at 351-352.

An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. 20 C.F.R. §§ 416.920; *Briscoe ex rel. Taylor*, 425 F.3d at 352; *Stein*, 892 F.2d at 44. A negative answer at any point, other than at step three, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four, and if it is met, then the burden shifts to the Commissioner at step five. *Briscoe ex rel. Taylor*, 425 F.3d at 352; *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir.1997).

## C.
## Analysis

### 1.
### Mr. Bradley's Objections to the ALJ's Decision

Mr. Bradley first contends that the ALJ failed to make a proper credibility determination under SSR-96-7p. He argues that the ALJ simply stated in a conclusory fashion that Mr. Bradley's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible and that the ALJ impermissibly summarized evidence without any meaningful explanation of why Mr. Bradley was not credible. (Pl.'s Mem. at 5).

Second, Mr. Bradley objects on the grounds that the ALJ's residual functional capacity assessment is insufficient as a matter of law and requires remand because the ALJ failed to include or to explain the lack of inclusion of Mr. Bradley's moderate limitation with social functioning in his RFC. (Pl.'s Mem. at 9). Specifically, Mr. Bradley argues that the ALJ did not explain how, if he found the migraines to be severe, he accounted for them in the RFC assessment. Mr. Bradley also argues that the ALJ failed to include in his RFC assessment that Mr. Bradley had moderate limitation with concentration, persistence, or pace and merely limited Mr. Bradley's work to unskilled, routine tasks. (Pl.'s Mem. at 11). Mr. Bradley further contents that the ALJ's hypothetical questions to the vocational expert did not include these limitations, which requires remand. (Pl.'s Mem. at 13).

### 2.
### The ALJ's Credibility Determination

The ALJ must support his credibility finding with articulate reasoning based on evidence in the record. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir.2009); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir.2003). In examining the credibility of the plaintiff, the ALJ must take into account a number of factors, including the objective medical and vocational

evidence, descriptions of the symptoms, treatments used to assuage those symptoms, and daily activities of the plaintiff. *Id*; *Simila*, 573 F.3d at 517; 20 C.F.R. § 404.1529(c)(2)-(4). The ALJ need not discuss every piece of evidence in the record, *Villano*, 556 F.3d at 562, nor does the "logical bridge" requirement specify how much depth the ALJ should go into – in other words, the very nature of the enterprise precludes quantification. *Steele*, 290 F.3d at 941. The ALJ need only rationally articulate the grounds for arriving at his decision from the evidence. *Id*. While the ALJ's credibility assessment and ultimate determination need not be perfect, it must not be "patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir.2010); *Outlaw v. Astrue*, 412 Fed. Appx. 894, 899 (7th Cir.2011); *Simila*, 573 F.3d at 517; *Berger*, 516 F.3d at 544. Demonstrating that a credibility determination is patently wrong is a "high burden." *Turner v. Astrue*, 390 Fed. Appx. 581, 587 (7th Cir.2010).

When determining the sufficiency of the credibility determination, a reviewing court must give the ALJ's determination "special deference," *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir.2010); *Briscoe ex rel. Taylor*, 425 F.3d at 354, because the ALJ, not the reviewing court, was in the best position to evaluate credibility, having had the opportunity to observe the plaintiff testifying during the hearing. *Jones*, 623 F.3d at 1160; *Simila*, 573 F.3d at 517. *Compare Ashcroft v. Tennessee*, 322 U.S. 143, 171 (1944) (Jackson, J., dissenting) ("A few minutes' observation of the parties in the courtroom is more informing than reams of cold record.").

### a.
### Degree Of Functional Limitation Is Not Consistent

In the instant case, the ALJ provided sufficient evidence justify his conclusion, and the plaintiff has not meet his burden of proving the ALJ was "patently wrong." In making a decision, the ALJ took into account the objective medical evidence, plaintiff's daily activities, medications, treatment history, medical and vocational experts' opinions, and plaintiff's

symptoms. The plaintiff's contention that the "ALJ here merely stated in a conclusory fashion" that the intensity, persistence, and limiting effects of his symptoms were not credible miscasts the ALJ's decision. (Pl.'s Mem. at 5). The sentence Mr. Bradley plucked from the opinion was conclusory, but that is because it was the ALJ's conclusion that came after almost two pages of analysis (R. 17-19), which then continued for another three pages after the sentence. (R. 19-22). It was more than supported by sufficient evidence.

The ALJ found that while the plaintiff was generally credible, the objective medical evidence did not support his claimed symptoms or the degree of functional limitations. "[D]iscrepancies between the objective evidence and self-reports may suggest symptom exaggeration. *Jones v. Astrue,* 623 F.3d 1155, 1161 (7th Cir. 2010). For example, while the plaintiff claimed that he suffered from major depression, severe migraine headaches, and substance abuse, the medical evidence indicated that he received treatment and was released when his condition improved. From the time he was discharged, he continued to receive treatment and his depression was deemed stable and controlled when on medication, which the ALJ described: "though the claimant experienced ups and downs in his mood, the treatment notes show that the claimant has experienced improvement." (R. 20). The ALJ further explained that the plaintiff's attention, thought process, thought content, and affect were deemed within normal limits, memory was fair, no new complaints, no side affects from medication, and an improved GAF score. (R. 20). These descriptions exemplify the ALJ's sufficient reasoning for asserting that Bradley's depression and mental capacity were stable and controlled. Furthermore, the consultative examiners' opinions supported the objective evidence that Mr. Bradley's allegations were not as restrictive as he claimed.

**b.**
**Bradley's Headaches as "Stable and Controlled"**

Specifically in terms of Mr. Bradley's migraine headaches, the medical evidence did not support the severity of his allegations. The ALJ found that two different doctors' notes stated that Bradley's headaches are "stable" and "controlled" which was inconsistent with the plaintiff's testimony of daily, severe, debilitating pain. (R. 22). Again, a discrepancy between the degree of pain claimed by the plaintiff and that observed or suggested by doctors and medical records is probative of exaggeration. *See Powers v. Apfel*, 207 F.3d 432, 435-436 (7th Cir.2000); *Sienkiewicz*, 409 F.3d at 804. Here, however, the plaintiff contends that the discrepancy was due to a difference between the medical definition and the everyday usage of the words "stable" and "controlled." (Pl.'s Mem. at 8). Yet, the medical record that the ALJ cited as describing Mr. Bradley's headaches as "stable" and "controlled" were doctors' progress notes similar to one particular note that indicated "no chest pain or headaches" and then at the bottom of that same page concluded "migraine stable" (R. 243). Another doctor's note similarly reported that the reason for discharge was that Bradley was "psychiatrically and medically stable" and his condition on discharge included, "no suicidal ideation, improvement in judgment, appropriate behavior, and no danger to himself or others." (R. 255-256). It is a reasonable assumption that because the ALJ drew the terminology "stable" and "controlled" from these doctors' progress reports, he must have reviewed the context of the doctor's report, and thus was able to conclude that "stable" and "controlled" meant an absence of headaches.

In further focusing on the difference between the definitions of stable and controlled, the plaintiff improperly relied on cases by either taking the courts' findings out of context or incorrectly equating Mr. Bradley's condition to more severe disorders. For example, the plaintiff's brief cited *Morales v. Apfel*, 225 F. 3d 310, 319 (3rd Cir.2000), as stating that a

"patient [who] is stable while on medication does not support a finding that the individual is capable of substantial gainful activity or able to hold down a job." (Pl.'s Mem. at 8). Yet, the plaintiff took this sentence out of context and misapplied it to Mr. Bradley's migraines.

The plaintiff in *Morales* was diagnosed with severe personality disorder and poly-substance abuse, resulting in depression, explosive violence, anti-social behavior, and attempted suicide. *Morales*, 225 F. 3d at 312-313. The nature of Morales' disorder was such that it oscillated from day to day and could be triggered by a variety of environmental stimuli, which all warranted the court's finding that being "stable while on medication" does not mean one can maintain a full time job. The court went on to explain that the extensive medical record, fully developed administrative record, and the whole record constitute substantial evidence that Morales was disabled, thus necessitating reversal of the ALJ's decision. *Id*. at 320. *See also Podedworny v. Harris*, 745 F.2d 210, 223 (3rd Cir.1984).

Unlike *Morales*, Mr. Bradley's headaches were far from a diagnosed disorder that made it impossible to work with others. When Mr. Bradley was on medication, his headaches were eliminated – according to doctors' notes – which is starkly different from the nature of Morales' disorder which medication only stabilized in particular environments and still rendered him "markedly limited." *Id*. at 319. The plaintiff's brief similarly neglected to mention these factual distinctions when citing to *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir.2000). Similar to Morales' personality disorder and unlike Mr. Bradley's migraines, the plaintiff in *Bauer* was medically diagnosed with bipolar disorder, and the nature of the disorder made it impossible to work with others. *Id*. at 607.

The Seventh Circuit in *Bauer* reversed the ALJ's decision on the grounds that the ALJ overlooked critical aspects of the record due to a lack of understanding of the nature of the

plaintiff's disorder. Judge Posner stated, "a person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days … [and] is likely to be the situation of a person who has bipolar disorder that responds erratically to treatment." *Id*. at 609. These were not the circumstances of Mr. Bradley's migraines.  For these reasons, the ALJ utilized the medical definition of stable and controlled to properly explain that Mr. Bradley's absence of headaches while on medication did not have a bearing on his work ability and that Mr. Bradley's exaggeration of his pain spoke to his lack of credibility.

The plaintiff also argues that the ALJ failed to make a proper assessment of how Bradley's headaches affected his ability to work citing *Indoranto v Barnhart*, 374 F.3d 470, 474 (7th Cir.2004). More notable than the absence of discussing the affect of the plaintiff's headache on his ability to work, was the fact that in *Indoranto*, the ALJ failed to alert the VE to the plaintiff's headache and blurred vision symptoms. *Id*. The court noted that "if the ALJ relies on testimony from the vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record." *Id. See also Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir.2004); *Kasarsky v. Barnhart*, 335 F. 3d 539, 543 (7th Cir.2003); *Steele*, 290 F.3d at 942. Unlike in *Indoranto*, the ALJ in the present case provided the vocational expert with the patient's information in the record and specifically asked the vocational expert about the effect of the headaches on work ability. The ALJ acknowledged that he gave great weight and deference to the medical and vocational experts, and in so doing, properly provided all the plaintiff's symptoms and limitations to the experts so that each would be able to make the determination of how much significance should be given to the plaintiff's headaches.

The ALJ dedicated two paragraphs to the psychiatric assessment of Mr. Bradley, giving weight to the DDS psychiatric consultant and Dr. Schiff's expert testimony, and how such an assessment may have affected Mr. Bradley's daily living and work-related functions. (R. 22). After reviewing the experts' findings, the ALJ determined that the claimant was functional mentally and able to carry out activities of daily living and to perform work-related functions. (R. 22). Such an assessment of Bradley's credibility was based on review of the collective record and all of Bradley's claimed symptoms, not a single symptom. The ALJ adequately considered the cumulative effect of the plaintiff's impairments. *See Parker v. Astrue*, 597 F.3d 920, 921-922 (7th Cir.2010); *Villano*, 556 F.3d at 563.

### c.
### Physical Ailments

Mr. Bradley's alleged physical ailments were not supported by the objective medical evidence in the record and were contradicted by his daily activities, which widened the discrepancy gap between Mr. Bradley's allegations and the medical record. The ALJ pointed out that nowhere in the objective medical record was there support for the plaintiff's contentions of arthritic pain at a level of six out of ten on the pain scale (R. 22). The ALJ gave little weight to Mr. Bradley's contention of right shoulder pain because he was well enough to play softball in July 2009. (R. 22). Plus, the ALJ discussed that Dr. Hare's physical examination of the plaintiff did not uncover any such physical ailments. In fact, Dr. Hare reported that Mr. Bradley had no problems walking, standing, sitting, reaching, or with extending and flexing his extremities. (R. 21-22). Finally, the ALJ acknowledged that even though a treating physician noted that Bradley was "somewhat limited by right pain" in walking, he also noted that Mr. Bradley was able to easily walk three to four blocks and climb two flights of stairs. (R. 22, 371). Since the ALJ did not need to discuss every piece of evidence in the record, *Villano*, 556 F.3d at 562, his mention

of and reason for not including Bradley's physical ailment is indicative that the ALJ did not ignore the evidence that conflicted with his conclusion. *See, e.g.*, *Herron*, 19 F.3d at 333–334; *Briscoe ex rel. Taylor*, 425 F.3d at 354.

### 3.
### Sufficiency of RFC Determination

In between the fourth and fifth steps of ALJ's sequential process, the ALJ must consider an assessment of the plaintiff's residual functional capacity (RFC), which is an assessment of what work-related activities the plaintiff can perform despite his limitations. *Dixon*, 270 F.3d at 1178; *Young*, 362 F.3d at 1001. The residual functional capacity assessment is the "most [the plaintiff] do despite [his] limitations." 20 C.F.R. Sec. 404.1546(a)(1). In constructing the claimant's RFC, the ALJ must consider all impairments, even if each, taken individually, is not severe. SSR 96-8p. In reviewing the ALJ's decision, a court cannot reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute his own judgment for that of the ALJ. *Young*, 362 F.3d at 1001; *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir.2003); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir.2003). Rather, the court's task is to determine whether the ALJ's factual findings are supported by substantial evidence. 42 U.S.C. § 405(g); *Jens*, 347 F.3d at 212; *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir.1997). The RFC assessment must include a "discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p.

Mr. Bradley's second major criticism of the ALJ's decision is that the ALJ improperly evaluated his RFC under SSR 96-8p. Specifically, Mr. Bradley claimed that the ALJ failed to include Mr. Bradley's moderate limitation with social functioning and with concentration, persistence, or pace in his RFC assessment. On this objection, Mr. Bradley has met his burden in

proving that the ALJ did not provide sufficient evidence in explaining how he limited Mr. Bradley's residual functional capacity to simple, unskilled, routine work. Since conclusions of law are not entitled to the special deference awarded credibility determination if the Commissioner committed an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt*, 496 F.3d at 841.

**a.**
**RFC Limitation in Social Functioning**

As for Mr. Bradley's first objection related to the RFC assessment, Mr. Bradley claims that the ALJ failed to include his moderate limitation of social functioning. It was incumbent on the ALJ to explain whether and to what extent he considered Mr. Bradley's moderate limitation in social functioning to confine the RFC to simple, unskilled work. The ALJ should clarify his position on remand.

The ALJ found that Mr. Bradley had "moderate difficulties in maintaining social functioning." (R. 17). This finding was based on his report that he did not enjoy being with people, and his girlfriend's report that he did not get along with others when his personality changes and he was once fired for not following orders. (R. 18-19). It is unclear from the ALJ's decision how these factors led the ALJ to conclude that Mr. Bradley had moderate difficulty in social functioning, how it inhibited Mr. Bradley's ability to work in medium skill tasks, and why it would not affect his ability to perform simple, routine, unskilled work. Even a moderate limitation in the ability to respond appropriately to supervisors may seriously undermine a claimant's ability to work. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 621 (7th Cir.2010) (citing 20 C.F.R. §404.1545(c); SSR 85-15). The ALJ "must explain why he does not credit evidence that would support a claim of disability, or why he concludes that such evidence is outweighed by other evidence." *O'Connor-Spinner*, 627 F.3d at 621; *See also Giles ex rel. Giles*

*v. Astrue*, 483 F.3d 483, 488 (7th Cir.2007); *Zurawski v. Halter*, 245 F.3d 881, 888-889 (7th Cir.2001).

The ALJ also erred in providing Mr. Bradley's limitation with social functioning in his hypothetical question posed to the vocational expert. When evaluating a plaintiff's capacity for work, an ALJ commonly poses a series of hypothetical questions to the VE that describe the plaintiff's conditions and limitations, and the VE will testify to the number of jobs that the plaintiff could perform based on those limitations. *Simila*, 573 F.3d at 520. The ALJ "must include all limitations supported by medical evidence in the record." *Steele*, 290 F.3d at 942. Although the ALJ determined that Mr. Bradley had moderate difficulty maintaining social functioning, the ALJ failed to provide this limitation to the VE in the hypothetical questioning. As a result, the VE's opinion was based on an incomplete picture of Mr. Bradley's imitations.

That opinion failed to account for an inability to accept instructions or respond appropriately to supervisors, to make plans independent of others, to interact with other employees, or to perform other activities in the work place despite difficulties with social functioning. *See Young*, 362 F.3d at 1005 ("When the hypothetical question is fundamentally flawed because it is limited to the facts presented in the question and does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand").

The Commissioner argues that the ALJ's social functioning analysis was harmless error because it is not a factor in one's ability to function when "working with things, rather than with people." 20 C.F.R. Pt. 404, Subpt. P., App. 2 §§ 201.00(i), 202.00(g) (D.'s Mem. at 8). However, the full context of the cited provision states: "while illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in

25

the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communication in English has the least significance." Even in simple, unskilled work, an employee would have to be able to follow instructions from supervisors. Moreover, "least significance" does not mean "no significance" and does not justify an ALJ's elimination of the limitation from assessment by the VE.

The error was not harmless. The Seventh Circuit has found that harmless error is applicable in the judicial review of administrative decisions when "it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, [and] then remanding is a waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir.2010). However, Judge Posner further explained in *Spiva* that it is a falsely overboard understanding of harmless error to think that:

> If [the government] can find enough evidence in the record to establish that the administrative law judge *might* have reached the same result had she considered all the evidence and evaluated it as the government's brief does, it is a case of harmless error. But the fact that the administrative law judge, had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless. Had she considered it carefully, she might well have reached a different conclusion.

*Id.*; *See also Securities and Exchange Commission v. Chenery Corp.*, 318 U.S. 80 (1943).

The Commissioner argues that the ALJ's absence of an explicit social functioning limitation in the RFC assessment was harmless error because the nature of working with things rather than people minimizes the importance of social functioning and the limitation to unskilled work incorporated the concern for social functioning. Since the ALJ did not explain his justification for why Bradley had a moderate limitation in social functioning how such a concern

should limit Bradley to unskilled work, it is inappropriate to assume that the absence of social functioning meant it did not bear on Bradley's ability to work. As the Seventh Circuit has repeatedly found, the ALJ must issue a have a well-reasoned decision that articulates his analysis and explains why contrary evidence does not persuade. *Herron*, 19 F. 3d at 333; *Sarchet*, 78 F.3d at 307; *Berger*, 516 F. 3d at 544; *Spiva*, 628 F.3d at 353.

If the ALJ does find that Mr. Bradley's moderate limitation in social functioning does not affect his ability to work in simple, unskilled tasks, then he needs to explicitly say so and explain how he arrived at that conclusion. *See, e.g.*, *O'Connor-Spinner*, 627 F.3d at 621 (remanded because the Commissioner did not explain how the claimant's moderation limitation on responding appropriately to supervisors undermined his ability to work). In the alternative, if the ALJ finds that Mr. Bradley's moderate limitation in social functioning does affect his ability to work, then the ALJ's decision is compromised and he must revisit the record. In either instance, the case should be remanded for the ALJ to explain whether or not Bradley's moderate limitation in social functioning affects his ability to perform unskilled work and why.

**b.**
**RFC Limitation in Concentration, Persistence, or Pace**

Mr. Bradley's second objection to the ALJ's RFC assessment is that the ALJ failed to include Mr. Bradley's moderate limitation of concentration, persistence, or pace. Similar to the limitation with social functioning, the ALJ must articulate his reasoning for how and why this limitation restricts Mr. Bradley to unskilled work, and the ALJ must include all limitations supported by the medical record when posing the hypothetical to the vocational expert. Even though the ALJ described *what* deficiencies Mr. Bradley had in regards to concentration, persistence, and pace, the ALJ did not explain *how* and *why* such deficiencies exclude Mr.

Bradley's ability to work at a medium skill level but not an unskilled level. The ALJ should clarify his position on remand.

The ALJ found that Mr. Bradley's moderate deficiencies of concentration, persistence or pace limited him to simple, routine, unskilled work. (R.17, 20-21). The ALJ did provide an explanation for each of Bradley's deficiencies: concentration ("[t]he claimant and his girlfriend in her third party function report have both expressed concern over his 'forgetfulness' and ability to concentrate"; "the claimant added that he has problems concentrating and staying on task; he stated he loses his concentration about every 10 or 15 minutes"), persistence ("[he] completes chores such as vacuuming and sweeping at home" and he is able to "take care of his personal care"), and pace ("he is competent in his activities of daily living"; "he can climb thirty or more stairs"). (R. 20-21). The ALJ also discussed Mr. Bradley's improvements: the plaintiff's "difficulties in calculation, memory, thinking, and judgment" were completed one month before he began his treatment of substance abuse, of which he finished treatment on the stipulation that "his condition improved since May 2007 and he consistently assessed a score of 55-60 on the GAF." (R. 20).

The ALJ gave significant weight to the vocational expert's opinion in restricting Bradley from performing medium or heavy, semi-skilled and allowing him to perform simple, routine, unskilled tasks. However, the ALJ failed to explain how he connected the dots between the evidence and his conclusion. *Sarchet*, 78 F.3d at 307; *Berger*, 516 F.3d at 545; *Dixon*, 270 F.3d at 1176. Specifically, the ALJ did not express *why* Bradley's deficiencies inhibit him from working at medium, heavy, semi-skilled work but not from simple, unskilled work.

As with social functioning and following instructions, the ALJ did not include the finding regarding moderate limitations in concentration persistence and pace in the hypothetical to the

VE. Again, the ALJ used the short hand of "routine, simple, unskilled work." An ALJ must orient the VE to such limitations. *O'Connor-Spinner*, 627 F.3d at 619. While there are some exceptions to this rule such as the VE reviewing the medical record or listening to the claimant's testimony regarding his limitations 627 F.3d at 619, the Commissioner does not argue that such was the case here. (*Defendant's Memorandum*, at 7-8). Indeed, while it would appear that the VE examined the vocational record (R. 70), "no evidence exists here that the VE reviewed [Mr. Bradley's] medical history, as opposed to just h[is] work history, or heard testimony about the limitation." 627 F.3d at 619.

Another point of contention that the ALJ should explain more thoroughly on remand is how the ALJ used Mr. Bradley's daily living activities to explain his ability to perform work-related activities. The ALJ concluded that Mr. Bradley was competent in his activities of daily living when he was compliant with his medication, as was evident by Mr. Bradley's wide range of daily activities: going to the park and fishing with friends, mopping, vacuuming, and sometimes cooking and shopping (R. 19-22). Specific, detailed descriptions of the claimant's daily activities provide the ALJ with insight into the claimant's allegations of pain to be able to make a reasoned explanation of his ability to work. *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.1994); *See also Jones v. Shalala*, 10 F.3d 522, 525 (7th Cir.1993); *Torres v. Barnhart*, 139 Fed. Appx. 411 (3rd Cir.2005).

However, the ALJ must be aware that "activities of daily living with only mild limitations need not translate into an ability to work full time." *Spiva*, 628 F.3d at 352. Just because somebody is able to cook, clean, or babysit does not necessarily translate to driving a forklift, lifting boxes, or working other full time jobs. *See, e.g., Id.* (babysitting did not translate to full-time job as stock worker) *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir.2005) (cooking,

cleaning, shopping, and caring for two small children did not equate to full-time work because "Gentle *must* take care of her children, or else abandon them to foster care"); *Morales*, 225 F.3d at 310 (the court held that Morales' impaired ability to function at work-related activities should not be supplanted by his ability to function in environments absent of the stresses that accompany work settings). This was exactly what the ALJ did in the instant case: even though he explained the evidence that supported Mr. Bradley's deficiencies, he transferred his abilities at home and in his daily life for those necessary to work full-time. The ALJ did not explain how Bradley's deficiencies did not affect his ability to concentrate or perform daily life activities or why such a lack of disruption in his daily life was indicative of his ability to perform simple, unskilled tasks in the workforce. For these reasons, the case should be remanded to the ALJ to provide a logical articulation of his reasoning.

## CONCLUSION

The Plaintiff's motion for remand should be GRANTED and the Commissioner's motion for summary judgment should be DENIED. The case should be REMANDED to the ALJ for further proceedings consistent with this opinion.

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

DATE: 9/21/12